Good morning, Your Honors. Don Haviland from Haviland Hughes, Counsel for the Appellant, Jimmie Mae Carter. I'd like to use all my time in this session to answer any questions the Court has, once I make the one important point here, which is what this case is about. This case is about Amgen's conduct. It's about Amgen's conduct in promoting off-label uses and doses of a drug. We've alleged in our complaint that Amgen's conduct in promoting off-label uses and doses of a drug. I can't agree. I mean, Matt, that's what the case is about. But the appeal is whether or not your client complied with the statute of limitations. And if the district court properly thought that she did not, then you have no basis for an amendment. There's no argument as to the pleading standard. And you're out of luck, don't you think? I don't disagree that the dismissal is based on the statute of limitations. I think, Your Honor, the question is what was the plaintiff supposed to know? Her husband was named as a class representative, a named plaintiff, in the first litigation that Steve Berman and others brought. Right, Your Honor. It's a little unclear to me from reading the briefs exactly what happened to Harold. There's some reference to the fact that he was dropped from the litigation. I'm not quite sure what that means. He was invited to become a named representative and then was dropped by Mr. Berman's office into the litigation. He didn't finish as a representative plaintiff. So was there a formal motion to dismiss Mr. Harold? No, Your Honor. He was just not included in the settlement. In the eyes of the law, why is he still not represented by Mr. Berman? I think what Your Honor is asking about is this imputation argument about whether or not a lawyer. Because clearly Berman knew. There's no question Berman knew something. Now, our concern is Berman, we don't see any evidence in the record he knew about the criminal conduct that came about with the T-Town Relators. I thought he brought a second action basically challenging the content of the labels and whether or not there were warnings that this was contraindicated. He did, Your Honor. About a year into the litigation that Mr. Carter was involved in, he came across the country with another plaintiff and filed another lawsuit alleging studies and there were two drugs, EPO and Aranes in his case. He didn't have a factual predicate, and that's really the standard I think this court adopted in the UCFW. But it's new or had reason to know, is it not? The question is could he have engaged in, you know, some discovery or some prefiling investigation that would have revealed what is now your theory of liability in this lawsuit? I think what Your Honor is asking is when he's involved in a pricing lawsuit which involves AWP inflation, and there's no question by the settlement agreement in AWP that this matter was carved out as of 2011, 2012. So clearly Mr. Berman knew that something was going on here. The imputation argument. It goes a little further than that. I mean, Mr. Berman is a very careful lawyer. I've litigated against him in my prior life. The question is whether or not in pursuit of damages for the more expensive Amgen product that Mr. Carter purchased for several years, anybody ever asked why did the doctor switch from the cheaper medication to the more pricey medication? And now, of course, the theory is that that should never have been done for medical reasons. But the question is how difficult would it have been to find out the reason for the switch? Well, that's the ultimate question, Your Honor. In 2012, the company was prosecuted, pled guilty. All the ketamine-related complaints came out with the facts. Most importantly, the Osiecki complaint that detailed what happened in Texas with my client's condition. I don't see anywhere where Mr. Berman had knowledge of those facts. None of the pleadings that were litigated ever brought forward the fact that the company was going into these hospitals and these clinics and saying, here's why we want you to switch. We're going to use a study, this CHIRU study that was ultimately discredited in 2007. That became the key marketing tool to use around the country to get doctors to switch patients. And that clearly happened to Mr. Carter. But the theory, as I understand it, was that the detail men were flogging this new drug because it was more profitable for the doctors to prescribe the drug. But again, the question, I guess, that I'm wrestling with is, as part of the investigation into why the detail men were able to convince the providers to switch to the more expensive drug, you're telling me nobody ever inquired as to what this drug was or what its effects were on patients? Because it seems to me that doctors wouldn't have switched to it if representations had not been made to them about the safety and efficacy. I don't see, Your Honor, any indication in the AWP cases where I was counsel for a period of time, any indication that off-label promotion was part of that case. Indeed, it was carved out of the settlement, obviously because Mr. Berman had to expend it. I have a little trouble with your off-label theory only because, by definition, a drug that is used off-label is being used for something different than what the drug was manufactured for. And doctors can do that.  But your theory is, in part, that the doctor, I guess, or Amgen, misled the medical community because they didn't prescribe the right dosage levels and they didn't warn them that there were contraindicated uses of the drug and so on. But I wouldn't expect that in an off-label use unless there had been some communication between the company and the physicians as to whether this drug was efficacious and safe. And that's ultimately where, Your Honor, we asked the court when the court made clear that that standard was the standard that we were going to be governed by. We wanted to replead to focus just on safety and efficacy. But the problem is if that, if new or reason to know goes as far back as the company says it does, then clearly the statute of limitation had run before this lawsuit was filed. Well, the difficulty I'm having with the label argument, Your Honor, it would adopt a principle that every time a cancer patient got an injectable medication, a label they never saw or intended to see would put them on notice to sue a company. I suspect that would be Rule 11 if we had sued Amgen at that point in time. So the label doesn't tell the patient anything. In fact, if the patient had seen it, all they would have known is they were getting it for off-label indications, which wouldn't, it's not our case, that's not a case. You need the bad conduct. You need the misrepresentation. And there's a clear statement. So why wouldn't Mr. Berman have done some investigation or discovery into that fact? We don't know if he did, Your Honor. We don't know that he ever found those facts, because everything that was done in in-ray epigen when it came up to this Court, it was dismissed. In fact, someone conceded at the podium in this Court that there were no such facts. The Osiecki complaint, which came about in 2012 and beyond, says that there was great news, there's a new indication for anemia of cancer, and that we're going to now promote for Q2W doses, which weren't approved. They were sponsoring the efficaciousness of it. That wasn't known. That could not have been known. And whether it could have been discovered by Mr. Berman if he was looking at that theory, we don't know that. But this imputation argument, Your Honor? He had to be able to explain why the doctors switched, didn't he? Well, I think it was return to practice. The case was all about the spread marketing of AWP inflation and the money that you can make. You'll make more money with medication. So is your theory solely one of economy, that it was more profitable for the doctors and therefore they did it without ever asking whether or not this might be harmful to their patients? No, Your Honor. That is the AWP theory. That's the theory that was promulgated there, that there's a differential between the two drugs and that the spread is what caused that. And the damages and I believe why that case was settled and some money was paid. Our theory is that drug should not have been dispensed in this case because this patient was getting it for an unapproved use with a message that said there's a new indication and that it is safe and efficacious when it wasn't. We found that out after March of 2007. That label change didn't help Mr. Carter in 2004, 5, 6, or 7. Do you allege any place in your complaint what your client or her husband, that they were unable to discover the injury earlier? Yes, Your Honor. In the fraudulent concealment tolling portion of our complaint, we lay out that the plaintiff could not have known the conduct. And the conduct is laid out in paragraphs 56 to 62 and 67 to 77. The reason I ask that question is I looked there pretty closely and I'll go back and read what you just told me. But it seems to me that this label use could have been found. We're saying knew or could have known. It seems to me the label use could have been found. I don't see any allegations that you even looked and they couldn't find it. I didn't find any allegation that it was impossible to find. Then if the label use was findable, then it seems that Judge Tallman's questions are pretty tough. And if the label use is findable, then why when one's getting this for something that's not on the label, didn't someone ask the doctor? So, Your Honor, if I may answer the question. That is the question. If it was simply the doctor making his independent judgment, then there would be no case. Osiecki says that that's not what happened. Well, but I'm not on to why it happened. I'm on to what did your client do to discover, knew or should have known. The label use, you're going to argue it isn't, I can't find out what the label use is. I couldn't even have asked my doctor about that because it seems to me if one had known the label use, one could have said to his doctor, hey, why do you prescribe this? It isn't on the label. And, Your Honor, that's true. And if the patient had found out that it was off-label. I mean, that's just a simple question. And then I say to myself, so why isn't that should have known? One can argue didn't know, but why isn't that should have known? Your Honor, that's the should have known of the off-label use, which isn't a case. It should have known the conduct that led to the switch. And that's our argument, that we could not have known the conduct that caused that switch. The ultimate fact question, which you raise, Your Honor, is did the doctor prescribe it in his own independent medical judgment or because of the conduct? But the conduct could not have been known until it was revealed. Are you appealing the dismissal of the complaint for the contraindicated use of the drug? We're saying that it was. Here, are you appealing that issue? We're appealing it. I think Judge Scuderi is. Because I looked very carefully at your pleading, and I didn't see it. We're appealing the issue of whether or not we could amend to have the safety and the efficacy argument because we weren't able to draw that out broader to the judge. But it seems to me you did allege something. The district court said no. It's too late. But I didn't see that you appealed that indication. We're not appealing contraindication. That's true, Your Honor. But we are appealing the lack of safety and efficacy and the ultimate conduct that led to the prescription. And that's the point I'd like to leave with, that that conduct could not have been known. And that's ultimately the standard for the discovery. Are you alleging fraud? Fraud is a misrepresentation of the concepts of consumer fraud, yes, Your Honor. So do you use the pleading standards effective for fraud? Yes. We believe we followed the standard that was in an in-ray epigen beginning at page 22 that then was affirmed by this court. So what was the fraudulent misrepresentation that you allege? So, as I said, the marketing message, which I just read to you, was in Osiecki's complaint at paragraph 189. She says, we have great news. There's a new indication, a new indication which means it's an approved use for ARINES for anemia of cancer. Why does it say that? It's a new indication. Just because you're suggesting it's a new indication, that makes it fraudulent? It's a misrepresentation. It's not a true statement. But fraud is where you are. Right. The misrepresentation is ultimately the standard that the judge gave us in the district court in an in-ray epigen, said that if you have a particularized fact of a misrepresentation of efficaciousness, And that's the use of the CHIRU study beginning in 2003, which was used as part of a marketing plan, was disproved in 2007. Counsel, I let you run over about three minutes. Yes, Your Honor. Let's hear from Amgen. Thank you. Appreciate your time. Good morning, Your Honors. May it please the Court. We really do rest here on the district court's opinion. This district judge had lots of experience with these cases, not just this case, but others on the Araneft drug. It's important to focus on the allegations. The allegation here is that Carter did not know that it was an off-label use. I'd like to link up two pages in the record. The first page in the record is his own declaration in 2006 in the AWP case where he says two things. And this is a record reference here. His declaration is at ER 262, 263. He says two things. One, my lawyer is Don Havlin, not Steve Berman, but Don Havlin. Now, Berman also represents him as a matter of law. And then he says, you know, Mr. Havlin keeps me informed about everything that's going on here, and I think he's a great lawyer for me. You then can go look in our supplemental excerpts at pages 76 and 77 and see the allegations in that complaint. Mr. Carter was deposed in that case, and he says at the beginning of his deposition, this exhibit 1 in my deposition is the complaint, and I've read it. And at SER 7677, it says what the uses are for Araneft. So in 2006, clearly Mr. Carter knew what the uses were. So the allegation that she couldn't, the plaintiff here couldn't have known, which has a pleading flaw as well, is not supported by the record. The other thing that's clear is that by 2007, they had an indication it was unsafe. There was a black box warning put on the drug. So from 2007, you would run 4 years to 2011. This complaint was not filed until 2014. How do you respond to the argument that Mr. Havlin made, which as I understood it was because he was getting the drug by injection, he would never have had any reason to see the box that the drug came in? Well, I agree with that in the following sense. There's no allegation that Amgen ever had any contact with Mr. Carter or the Carters, no contact whatsoever. Maybe I didn't make my question very clear, Mr. Little. If he went into the doctor's office and they simply said, okay, we're going to give you your monthly or your biweekly injection, whatever it was, he wouldn't necessarily have even seen the bottle that the drug came out of. I agree with that. But the doctors saw that label. So the idea that there was any misleading conduct here that would lead to Mr. Carter isn't there. The doctors were told quite accurately that here are the uses for Aronesque. And so the doctors almost leading here. The other point I think is what Judge Smith mentioned. His complaint carefully alleges he was switched and was not told. And every time I read that, I write in the margin, did he ask? Inquiry notice is what's required for the statute of limitations. California law says that. This Court has said that in the Denholm case. And the last thing I'd like to say on the statute of limitations is if you read the excerpt of record page where the statute of limitation is addressed in their complaint, excuse me, I've got to give you a page reference, S.E.R. 415 and 416, it's only two pages. We had filed, Amgen had filed a prior motion to dismiss on the first complaint. Their response to that was to amend. In that prior complaint, we had said you're outside the statute of limitations. So this complaint should be responsive to that argument. There's only two pages. And really there's only one allegation. And it's a conclusory allegation that this Court has said in Denholm is insufficient. It simply says plaintiff could not have discovered the unlawful conduct by the exercise of due diligence, et cetera. And then it says why? Well, because this plea didn't happen until 2012. That's not an explanation for why they couldn't. So it fails on the pleading standard for the tolling of the statute as well as on the facts. Your Honor, I'm happy to address other questions. We do think that if the ---- I would like to address the question about the district court dismissed the complaint regarding the allegations that the drug was unsafe. Right. Would you respond to the error alleged in that? Well, we don't think there was an error. Why not? Yes. So, first, the district court dismissed the complaint without prejudice to a further amendment. The plaintiff had already said in their opposition to the motion to dismiss, we intend to amend. The district court said, well, I dismiss that part without prejudice because you haven't alleged it in your complaint. You haven't alleged unsafe. If you could come back and make those allegations, you can amend. And the district court gave four weeks to do that. And it wasn't until three of those weeks had passed that a motion to extend that time even further for a second amendment complaint came in. And all it said was we need more time. It didn't explain why. And the judge ---- So you're suggesting then the district court did not abuse its discretion in saying no, we're done? That's exactly right, Your Honor. And at some point litigation has to end. This judge had seen a lot of it by that point. But to answer the original question, the dismissal on the unsafe drug issue was done without prejudice because of the failure to comply with the time given for the amended complaint, right? That's correct, Your Honor. Judge Smith asked you to respond to that question. Well, I think it was not an ---- I think he's exactly right. It was not an abuse of discretion to give more time to file an amendment making those allegations which were not in the first amendment complaint. And then when that time had expired, even when the judge denied that motion, the district judge, there were three days left in the period and they still filed nothing. So I don't think the judge abused his discretion. It's about the idea that the district judge was wrong, that there are allegations in this original complaint which allege an unsafe theory of liability. Let me say two things to that. One thing, I think you do have to go to ---- Because, frankly, you've got two prongs here. One is they had it already. The second is they abused, he abused his discretion in not allowing more time to amend. Let's go back to that. They had it already. They had that information already, Your Honors? No, that it's in the complaint already. Yeah. So I do think if you're reviewing this de novo, you can take notice of the fact that they knew it was unsafe in 2007 and that there was no complaint filed within four years of that date. So it's invalid under the statute of limitations. That's one. Two is that there's never an allegation in any pleading in this case that says Amgen knew it was unsafe at the time that Mr. Carter was doing this. And then three is, as this district judge did in the prior Arron F. cases, the Epigen cases, the district judge dismissed and said, if you have made certain allegations that might survive, they're too intertwined with everything else, so I'll dismiss and give you a chance to amend. And this Court then affirmed in that case when they failed to amend. So I think Judge Gutierrez did the same thing here. He simply said, to the extent you've made these claims, wherever you've made them, I can't see them. Here's a chance to amend. And then we go to the abuse of discretion standard. And so, Your Honors, I do think that the Court should affirm on the basis of the entire record. Thank you. Thank you very much. I'll give you a couple minutes in rebuttal, Mr. Applin. Thank you, Your Honor. I appreciate the leave. Judge Smith, I think you framed the issue properly in terms of the unsafe issue. When the district judge said to the plaintiff, I'm going to give you leave to amend, I see some efficacious arguments in your complaint, but you haven't crisply said a lack of safety, that told the plaintiff to go back and pull from the factual record you have, do an investigation further to make those allegations under Rule 11 that the company knew that it was, in fact, unsafe. We were in the process of doing that, and that's why we asked for additional time. Can you help me with the timing here? I thought in the briefing there was reference to the fact that at the time of the motion to dismiss, you made representations to the Court that if given leave to amend, that you could supplement your allegations on safety. And then the Court said, okay, I'll give you 30 days or 25 days to do that, and you didn't. I can tell you what's behind that. We were talking to Osiecki's counsel, and we were told by Osiecki's counsel that she no longer had documents, which we thought she had because she lays out a very detailed factual record citing documents. We wanted to review those documents. In fact, she actually had a document. Was this the key Tam relator? Yes, Your Honor, Osiecki. And that's really the one that ties the conduct and the misrepresentation down to the hospital where the client is treated because in her complaint, she uses a code SWRCC, which is the shorthand for Southwest Regional Cancer. That's how we know that the detailed activity went to that hospital. We were doing that investigation, and it was 25 days in the summertime. We asked for leave just to finish that because without documents, we had to talk to the witness to verify as ourselves, as counsel for the plaintiff, that these facts were, in fact, true. So you're suggesting when the district court said what it did on the 7th, still having more time to file an amended complaint, you didn't need to do anything? No, Your Honor. I'm saying the opposite. Now, just a minute. Here's what happened, as I understand it, so correct me. As I understand it, he said, you haven't got an unsafe theory liability. If you're going to plead one, I'll give you until August 10. Right. Then on August 3, you file for a motion for extension. At that time, you haven't even met, as I understand it, with counsel to discuss whether or hadn't even met among counsel to discuss whether they would amend. The district court says, I deny that request on August 7. You have three extra days. If you've got a theory, it seems to me, me being in your spot, not that long ago, I would have filed an amended complaint to suggest the theory as best I could based on what I had. And, Your Honor, we actually did talk. And you didn't. You didn't do anything. We talked as counsel when the order came down. We convened a meeting. If you see the pleadings, there's about 10 different firms. And when a judge admonishes all those firms to proceed under Rule 11, everyone took that seriously. We wanted to have an in-person meeting, which was conducted on August 6. At that point, it was decided to go forward. Despite the Rule 11 admonition, we thought we had enough to proceed with an investigation to complete that. That couldn't be done in a weekend. And, unfortunately, we ran out of time. We couldn't race to get something done on Monday morning when we got the denial on Friday night, Your Honor. And that's basically the reason for the time. Well, the trouble comes on all of this, that this is all an abuse of discretion. And I have a judge who's trying to help you. He's saying, well, and this judge is not any judge. This judge has had one of these cases or 40 of these cases before. He knows what the situation is. He says, you know, if you're going to do something on safety, I don't see it. You've got some time to get it done. And then you, rather than getting it done, put a motion for an extension in seven days before, because you haven't had your meeting with counsel, I guess. And then he says no, and nobody does anything. And I'm supposed to say the district court has abused its discretion? The concern for us, Your Honor, was making that rushed decision and filing something on penalty of Rule 11 without having completed the factual investigation that we all deem necessary. I mean, the bottom line is if I were talking abuse of discretion and I were sitting in his job, which I was not that long ago, I guess 10 years now. Dang, time flies. But here we are. I would have said that court, appellate court, doesn't have any shot at telling me I haven't abused my discretion. And I wouldn't have to do any more. Now I know what the facts are. I'm even saying, come on, the district judge abused its discretion on this? Your Honor, all I would say on that is what counsel for the defendant and the plaintiff agree. This is a very complicated case. It's a very dense record. It involves more than a half a dozen key time-relaters with reams of documents. And it took a lot of time when we got that order that really crystallized what the issue was to synthesize that. I work for a very qualified counsel in California, and we made a call not to file on Monday. And if we're in error about that, that's our call. Okay. We did ask for time, though. Thank you, Your Honor. All right. Thank you. I appreciate it.
judges: Tallman, N.R. Smith, Murphy